DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Kenneth Hogan, appeals from his conviction in the Akron Municipal Court. This Court affirms.
 I. {¶ 2} On November 16, 2005, Officer Daniel Engelhart of the City of Akron Police Department stopped Appellant and issued him a citation for driving under suspension. Officer Engelhart was on routine patrol in the downtown area of the City of Akron. There were not a lot of criminal calls for Officer Engelhart to respond to on this particular evening. Because it was a slow night, Officer Engelhart decided to run the license plate of an oncoming Chevy Caprice through his MDB, a small computer terminal in his cruiser that provides information concerning the registered owner of a license plate as well as information concerning the vehicle itself. He first noticed the Caprice driving westbound on Exchange Street, coming from the area of Brown Street. Officer Engelhart was traveling eastbound on Exchange Street. Before Officer Engelhart could turn around and get behind the vehicle, the driver made a quick turn onto Sumner Street and then a right turn into a McDonald's parking lot. While he had a view of the vehicle the entire time, he was not close enough to see the license plate number. Officer Engelhart made a u-turn and followed the Caprice into the McDonald's parking lot. He observed as the driver and sole occupant of the vehicle exited the Caprice. The driver, a large African American male wearing a matching jogging outfit, was subsequently identified as Appellant. Appellant walked in front of Officer Engelhart's cruiser and into the restaurant. While Appellant was still in the parking lot, Officer Engelhart learned from the MDB report that the vehicle owner's operator's license was under suspension. Officer Engelhart also noted that the description on the report matched the individual that he had seen exit the vehicle and walk in front of his cruiser. Officer Engelhart moved his cruiser to a less visible location and waited for Appellant to exit the restaurant. Soon thereafter, Appellant approached the vehicle with another individual, got into the passenger seat of the vehicle, and drove away. Officer Engelhart followed and stopped the vehicle based on the information he received in the MDB report. Appellant was charged with operating a motor vehicle with a suspended license in violation of Akron City Code 71.07.
 {¶ 3} At his arraignment on November 21, 2005, Appellant pled not guilty. His case proceeded to a jury trial on January 25, 2006. After the City rested its case and at the close of all evidence, Appellant unsuccessfully moved for a Crim. R. 29(A) motion for acquittal. Appellant was convicted on the charge and sentenced to a term of 180 days in the Summit County Jail and fine of $250.00. The trial court suspended the jail term and $100.00 of the fine. Appellant filed a timely notice of appeal, raising one assignment of error for our review.
 II. ASSIGNMENT OF ERROR
"[APPELLANT'S] CONVICTION FOR DRIVING UNDER SUSPENSION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF ART.IV, § 3 OF THE CONSTITUTION OF THE STATE OF OHIO, THUS CREATING A MANIFEST MISCARRIAGE OF JUSTICE BECAUSE THE GREATER WEIGHT OF THE EVIDENCE SHOWS THAT [APPELLANT] DID NOT OPERATE A VEHICLE ON THE NIGHT OF NOVEMBER 16, 2005."
 {¶ 4} In his sole assignment of error, Appellant argues that his conviction was against the manifest weight of the evidence. This Court disagrees.
 {¶ 5} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citingState v. Thompkins (1997), 78 Ohio St.3d 380, 390 (overruled on other grounds). When a defendant asserts that his convictions are against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id. A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than it supports the other.Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. at 388. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court. Karches v. Cincinnati
(1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see also, Otten, 33 Ohio App.3d at 340. If the trial court's judgment is against the manifest weight of the evidence, then an appellate panel may reverse the trial court. Thompkins,78 Ohio St.3d at 387. In the special case of a jury verdict, however, the panel must be unanimous in order to reverse. Id. at paragraph four of the syllabus, citing Sec. 3(B)(3), Art. IV, Ohio Constitution.
 {¶ 6} Appellant was convicted of operating a motor vehicle with a suspended license, in violation of Akron City Code 71.07. Appellant does not dispute that his license was suspended on November 16, 2006. Rather, Appellant argues, the greater weight of the evidence supports his contention that he was not the individual Officer Engelhart saw operating the vehicle.
 {¶ 7} During trial, the City offered the testimony of Officer Engelhart. Officer Engelhart testified to the following: On November 16, 2005, he was on patrol in the downtown area of Akron, Ohio, when he noticed a Chevy Caprice driving towards him. He was driving eastbound and the Caprice was driving westbound. Officer Engelhart further testified that there were not a lot of calls that night and that when he was not busy he would randomly run license plates. He explained that "running plates" meant typing the plate number into the MDB, and then submitting that to LEADS which also runs to the BMV. This allows an officer to check for a number of things, including; active warrants, driver status, registration of the vehicle, and whether the vehicle is stolen. Officer Engelhart testified that before he could turn around behind the Caprice to run its plate, the Caprice made a quick turn and then a right hand turn into a McDonald's parking lot. He testified that the vehicle was in his sight the entire time, but not close enough to run the plates. Officer Engelhart further testified that the driver was the sole occupant of the Caprice. The driver then exited the Caprice and walked in front of Officer Engelhart's cruiser as he pulled into the parking lot. As the driver walked by, "I took a good look at him to make sure I could identify him if I had to and then as I drove by his car[,] I entered his plate." Officer Engelhart testified that the driver, a "very large" African American male, was wearing a velour jogging outfit with a stripe and some purple in it and a matching top and bottom. He then identified Appellant in court as the driver and sole occupant of the Caprice. The information from the Caprice's plate number came back while the Appellant was in the parking lot. This information showed that the owner of the vehicle had a suspended license, and the physical description of the owner matched the man that Officer Engelhart observed exit the Caprice. Officer Engelhart then testified that he decided that it was not the best course of action to follow Appellant into the McDonald's, but rather it was better to wait for him to come back out and stop him when he left. Officer Engelhart pulled his cruiser into a parking lot across the street and waited for Appellant to leave the parking lot. He testified that he could see the Caprice well enough to tell when it left, but that he was hidden so Appellant would not see him. Approximately 15 minutes later, Appellant returned to the Caprice with another person. Officer Engelhart testified that he thought Appellant got into the passenger side but that he could not be sure due to the distance. The Caprice then left the parking lot. Officer Engelhart testified that "[a]s soon as I saw him backing out, I pulled out and I was right behind him actually by the time they left[.]" Officer Engelhart then testified that "to the best of my ability, I believe that the front seat passenger was the male that I had seen go in who had the physical description, physical characteristics of the * * * listed owner of the vehicle who was suspended." He also testified that when he stopped the Caprice, he found the driver sitting in the passenger seat, wearing the same clothes that he saw on the man in the parking lot. Officer Engelhart then issued Appellant a citation for driving under suspension.
 {¶ 8} On cross examination, Officer Engelhart indicated that running plates on a slow night is part of his job as a patrolman. He further testified that it was dark outside and he could not tell if the Caprice had a front plate or the exact color of the vehicle. Officer Engelhart testified that he could see the face of the driver as he walked in front of his cruiser, and that he believed the driver may have had longer hair and he may have had on a hat. Appellant's counsel also pointed out a discrepancy in Officer Engelhart's testimony regarding the color of Appellant's clothing. During direct examination, Officer Engelhart testified the jogging suit had purple in it. Counsel further pointed out that Officer Engelhart stated in a jury-status hearing that the jogging suit had a gold stripe on it. Finally, Counsel presented Officer Engelhart with his report prepared on the night of the incident, indicating the jogging suit was gray with red stripes. Officer Engelhart explained any discrepancy in his prior testimony regarding the color of Appellant's clothing as a mistake of recollection. He further explained that the report was accurate because it was "what I wrote the night I was looking at it."
 {¶ 9} When further questioned about the driver's exit from the McDonald's, Officer Engelhart testified that he could not describe the other person with the driver nor could he say from which direction they came. Officer Engelhart testified that he thought they came from the McDonald's. He stated that he "wasn't looking for anybody to come down Sumner [Street] because I had seen the driver of the vehicle go into McDonald's so I wasn't paying a lot of attention to anybody in the area." Officer Engelhart testified that he pulled the Caprice over approximately a block and a half away from the McDonald's.
 {¶ 10} On redirect, Officer Engelhart testified that the McDonald's parking lot was very well lit. He also testified that he had no doubt that the person who walked in front of his cruiser was Appellant. He further explained that any discrepancy regarding the color of the jogging suit was because the incident happened two months ago. At the conclusion of Officer Engelhart's testimony, the City rested its case, and Appellant moved for a Crim.R. 29 motion for acquittal.
 {¶ 11} The defense called two witnesses, Appellant and his friend Sharm Starks ("Starks"). Starks testified that she had called the Appellant from a friend's apartment because she was cooking and wanted to invite him to dinner. She further testified that Appellant arrived at the apartment late, she fixed him a plate, and he then asked her to drive his car for him. Starks testified that Appellant asked her to drive his car because his license was suspended. She testified that the two walked to the McDonald's parking lot, where the car was located, and she drove the car out of the parking lot. She testified that she pulled into her own driveway when Officer Engelhart turned on his lights and approached the car.
 {¶ 12} On cross examination, Starks testified that Appellant was wearing a jump suit and that many people use the McDonald's parking lot when the apartment complex lot is full. She also testified that she did not know how Appellant got to the apartment complex where the party was located, but that he gave her the keys to the Caprice so she could drive the car. She testified that he was only at the party for a short period of time.
 {¶ 13} The defense next called Appellant to the stand. He testified that his girlfriend dropped him off at school on the morning of November 16, 2005. He then loaned his car to his former roommate, Cory Amos ("Amos"), who dropped him off at class. Appellant testified that after class he stayed in the computer lab, and then went to a friend's house to study. He stated that he was at this house until ten or eleven o'clock at night. Appellant further testified that after he finished studying he walked to his friend's apartment complex where he was going to get some food. Appellant testified that when he got to the apartment there were a lot of people there and someone gave him his keys and told him that Amos had brought them there earlier. He then asked his friend, Starks, to go with him to his car. He testified that he asked her to drive it for him, and as they were driving a police officer pulled them over. Appellant stated that when the officer pulled the vehicle over, he informed the officer that he was the vehicle's owner and that he was not driving because his license was suspended. Appellant further testified that he could not recall what he was wearing that evening. Appellant testified that he did not operate his vehicle at any time on November 16, 2005.
 {¶ 14} On cross examination, Appellant testified that he regularly let his close friends drive his car but that he was not sure if they were insured. He testified that he was not sure who gave him the car keys at the apartment, but that he knew everyone there. He further stated that he had spoken with Amos earlier in the evening and was informed that Amos had left the Caprice at the McDonald's. Appellant testified that he did not notice if his car was in the McDonald's parking lot even though he walked past the restaurant while walking to the apartment complex to meet his friends. He testified that he was in the apartment for about 10 to 15 minutes. Appellant testified that Starks was driving him in his car around the corner, but she wanted to stop at her house first. Appellant testified that he did not know where Starks was dropping him off, but "probably at Cross Street to my old residence I don't know."
 {¶ 15} On redirect, Appellant testified that Amos also had friends who lived at the apartment complex, and that it was a "hangout" for all their friends. Appellant then unsuccessfully renewed his Rule 29 motion.
 {¶ 16} Appellant contends that Officer Engelhart mistook him for Amos, whom he alleged drove the Caprice and dropped it off at the McDonald's. To support his contention of mistaken identity, Appellant specifically argues that 1) the City presented conflicting testimony as to the identity of the driver of the vehicle, 2) the City's only witness made eyewitness identifications from an obscured view across the street and later as he traveled behind the vehicle, 3) the City's evidence as to how Appellant visited Starks' apartment despite allegedly entering the McDonald's was vague and uncertain, 4) the City failed to account for the similar body types and weights of Appellant and Amos, thus amounting to vague and uncertain evidence, and 5) the City's only witness lacked credibility as demonstrated by his actions preceding the stop and by the incredible nature of his testimony. We will discuss each argument in turn.
 {¶ 17} Appellant first argues that Officer Engelhart's testimony was conflicting as to the identity of the person who drove the Caprice into the McDonald's parking lot. He contends that Officer Engelhart's recollection of the Caprice driver's clothing was conflicting and therefore not credible. We do not agree. On direct examination, Officer Engelhart testified that the driver walked right in front of his cruiser and was wearing a jogging suit with a stripe on it and some purple in it. He further explained that he was recalling this from his memory. On cross examination, contrary to what Appellant states in his brief, Officer Engelhart indicated that he did not recall what he said during the jury-status hearing regarding the color of the clothing. However, when shown the incident report he wrote on the night of the stop, he stated that he had noted the jogging suit was gray with red stripes. Officer Engelhart explained that what was in the report was correct because the report was written when the event was fresh in his mind. His testimony that the suit had a stripe with purple in it, when in fact it was gray with red stripes, is not as conflicting as Appellant would like us to believe. Regardless of the color of the jogging suit, Officer Engelhart identified Appellant in court as the driver of the vehicle.
 {¶ 18} Second, Appellant argues Officer Engelhart made his eyewitness identification from an obscured spot across the street from the Caprice. Again, we do not agree. Officer Engelhart testified that "[Appellant] actually walked right in front of me as I pulled in. He got out of the vehicle, walked right in front of me." Officer Engelhart then identified Appellant in court as the man who walked in front of his cruiser. Officer Engelhart testified that he pulled his cruiser into a parking lot across the street to wait for the Caprice to leave the McDonald's parking lot. However, this was done after Officer Engelhart watched Appellant walk in front of his vehicle, where his view was not obscured. Officer Engelhart made his eyewitness identification before he moved his cruiser across the street. Appellant's second argument has no merit.
 {¶ 19} Next, Appellant argues that the City's evidence as to how Appellant visited Starks' apartment despite allegedly entering the McDonald's was vague and uncertain. We disagree. As stated above, Officer Engelhart identified Appellant as the man who drove the Caprice into the McDonald's parking lot. He later identified him as the man in the passenger seat when he pulled over the Caprice. It was up to the jury to determine whether to believe any, all or none of Appellant's account of his visit to Ms. Starks' apartment.
 {¶ 20} Next, Appellant argues the City failed to account for the similar body types and weights of Appellant and Amos, thus amounting to vague and uncertain evidence. First, the defense presented no evidence that Amos was present at the McDonald's during the time Officer Engelhart was conducting his investigation. Appellant alluded to this fact on the stand by stating it was "possibly" Amos that Officer Engelhart saw at the McDonald's. Factually, there was no evidence for the City to rebut. Second, defense counsel stated in his opening statement that the jury would hear from Amos and that he would testify that he had Appellant's vehicle on November 16, 2005 and parked it in the McDonald's parking lot. However, Amos did not testify at trial, nor did he appear before the jury. It is clear from Appellant's testimony on cross examination that Amos was available to testify at trial. The prosecutor inquired of Appellant:
"Q. Cory was here earlier today?
"A. Yes.
"Q. I mean before we actually started testimony and openings and stuff, he was sitting in the back for a while and then he was out in the hallway?
"A. Yes."
 {¶ 21} When a witness who is presumed to possess testimony favorable to the defense is absent, "it is not improper for counsel upon the other side to infer that his testimony would be unfavorable to the defendant [and that] the defendant's story of the transaction in question would not be corroborated if such witness was presented and testified[.]" State v. Komadina
(1994), 9th Dist. No 94CA005782, at *6, quoting State v.Champion (1924), 109 Ohio St. 281, 289.
 {¶ 22} While it is beyond question that the defense had no burden to call any witness in his defense, and the court so instructed the jury, the jury could reasonably have questioned the absence of such compelling corroborating evidence once Appellant chose to testify.
 {¶ 23} Further, Officer Engelhart identified Appellant in court as the man he saw driving the Caprice. Appellant states in his brief that due to the similarity in height and weight and the fact that Officer Engelhart observed the driver from at least twenty feet away, he must have confused Appellant for someone else. This argument lacks merit. The record indicates that Officer Engelhart's cruiser was "behind [the Caprice] just like perpendicular," when the driver walked in front of the cruiser and that the parking lot was well lit. Whether Amos and Appellant are of similar stature is not at issue as Officer Engelhart had a clear view of Appellant on the night of the incident and later identified him in court.
 {¶ 24} Lastly, Appellant argues that Officer Engelhart lacked credibility as demonstrated by his actions preceding the stop and by the incredible nature of his testimony. Appellant urges this Court to find that Officer Engelhart's testimony that he was randomly running plates because it was a slow night was incredible and unbelievable. We decline to follow Appellant's reasoning. Appellant argues that finding Officer Engelhart's testimony credible would require us to "suspend Common Sense and life experience." It is unclear why Appellant suggests Officer Engelhart's explanation as to why he chose to run a check on Appellant's license plate is incredible or unbelievable. However, we have stated that
"[w]hile random stops of vehicles without any reasonable suspicion of criminal activity may be constitutionally invalid, random computer checks of vehicle license plates are not. One does not have any expectation of privacy in a license plate number which is required to be openly displayed on his vehicle. R.C. 4503.21. Moreover, a scan of a computer data bank, in order to obtain information relevant to the license number, involves no intrusion. Such a `search' does not interrupt a driver in his travel, nor restrain his person or detain him. In sum, it does not even constitute a `stop[.]'" State v. Moss (Feb. 16, 2000), 9th Dist. No. 19698, at *2. quoting State v. Bates (Aug. 12, 1987), 9th Dist. Nos. 1576, 1577, at *1. See also, State v.Owens (1991), 75 Ohio App.3d 523, 525.
 {¶ 25} Therefore, we cannot agree that Officer Engelhart's testimony was incredible and unbelievable thus calling into question his reliability and credibility. We will not disturb the jury's determinations regarding the witnesses' credibility as "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 26} After a review of the evidence, we cannot say that the jury lost its way and created a miscarriage of justice when it convicted Appellant of driving under suspension in violation of Akron City Code 71.07. Given the testimony, this is not a case where the evidence weighs heavily in favor of the Appellant, meriting a new trial. Accordingly, Appellant's conviction was not against the manifest weight of the evidence. Therefore, Appellant's sole assignment of error is overruled.
 III. {¶ 27} Appellant's sole assignment of error is overruled, and the judgment of the Akron Municipal Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Akron Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Slaby, P.J., Carr, J., concur.